# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

ANGLE' GOLDSTON, et al.,          )
                                  )
              Plaintiffs,         )
                                  )
      v.                          )        1:21CV615
                                  )
ARIEL COMMUNITY CARE, LLC, et al., )
                                  )
              Defendants.         )

## MEMORANDUM OPINION AND ORDER

This case comes before the Court on "Plaintiff's Motion to Conditionally Certify Collective Action and Approve Notice" (Docket Entry 21 (the "Certification Motion")). For the reasons that follow, the Court will grant in part and deny in part the Certification Motion.

## BACKGROUND

Angle' Goldston (the "Plaintiff") initiated this action against Ariel Community Care, LLC ("Ariel"), Donnie Mann, and Pierre Pickens (collectively, the "Defendants"), asserting breach-of-contract and unjust-enrichment claims and further alleging that Defendants violated the Fair Labor Standards Act ("FLSA") and the North Carolina Wage and Hour Act. (See Docket Entry 31 (the "Operative Complaint"), ¶¶ 1-2, 8-10.) Plaintiff lodged such claims on behalf of herself and others (see id., ¶¶ 42-49 (defining two proposed collectives of similarly situated individuals and two proposed classes)) and further asserted, in an individual capacity,

"claims for retaliation under Section 215(a)(3) of the FLSA, and the North Carolina Retaliatory Employment Discrimination Act, N.C. Gen. Stat. §[]95-240, et seq. ('REDA')" (id., ¶ 3).

The Operative Complaint states, in pertinent part:

"Defendants operate a mental health support agency with offices in Yanceyville, Wilmington and Marion, North Carolina, and Douglasville, Georgia." (Id., ¶ 12.) Between 2017 and 2020, Defendants employed Plaintiff "as a peer support specialist, who provided mental health support to Defendants' clients" (id., ¶ 6; see also id. at 1 (lodging claims "on behalf of all other similarly situated current and former peer support specialists of Defendants" ("Putative Plaintiffs"))). "Defendants misclassified Plaintiff and [Putative Plaintiffs] as independent contractors until approximately January 2020 when Defendants reclassified peer support specialists as employees." (Id., ¶ 14.)

As a general matter, "Plaintiff and [Putative Plaintiffs] were economically dependent on Defendants." (Id., ¶ 30.) More specifically, "[t]he misclassified independent contractors, including Plaintiff, were [(i)] required to comply with Defendants' policies and procedures which were set forth in written company policies" (id., ¶ 22), (ii) "supervised by employees of Defendants" (id., ¶ 23), and (iii) "subject to discipline [by Defendants]" (id.). Additionally, Plaintiff and Putative Plaintiffs "received all [work] assignments from Defendants" (id., ¶ 24), who

"advertised and posted job openings on social media and labor sites" (id., ¶ 25). Furthermore, "Defendants directed the work of Plaintiff and [Putative Plaintiffs] and provided substantial oversight of their activities." (Id., ¶ 26.) Those individuals performed work "integral to Defendants' business . . . [, w]ithout [which ]Defendants could not have performed their contracted responsibilities for their clients" (id., ¶ 27) and from which "Defendants profited directly" (id., ¶ 28). "Plaintiff and [Putative Plaintiffs] could not negotiate their compensation with Defendants' clients and [] did not share in the profits." (Id., ¶ 29.)

Before and after the reclassification, "Defendants required, and continue to require, [peer support specialists] to perform off-the-clock, unpaid work including, but not limited to, completing client notes, traveling between clients, reading and answering texts and emails or otherwise communicating with Ariel staff, training and attending staff meetings" (id., ¶ 15). (See also id., ¶¶ 34–38.) Defendants did not compensate Plaintiff (see id., ¶ 17) or Putative Plaintiffs (see id., ¶ 31) for such tasks. Additionally, "Defendants failed to pay an overtime premium to Plaintiff and [Putative Plaintiffs] for all hours worked over [40] in a workweek." (Id., ¶ 32; see also id., ¶ 31 ("Defendants paid peer support specialists who were misclassified as independent

3

contractors by the hour and paid straight time for all hours worked . . . .").)  Finally:

> As the result of an investigation by the United States Department of Labor, Defendants back paid some employees for unpaid overtime wages.  However, not all employees received their full unpaid overtime wages.  For instance, Plaintiff was not back paid wages until on or about October 29, 2021, months after Plaintiff initiated the current litigation to seek her unpaid compensation. Furthermore, Defendants' back payment did not include all overtime wages earned including overtime wages associated with off-the-clock work, liquidated damages, interest and costs.  Moreover, the back payments did not include payment for all off-the-clock work performed.  Plaintiff is aware of other current and former employees of Defendants who were subject to the same payroll practice.

(Id., ¶¶ 39-41 (internal paragraph numbering omitted).)

After the parties submitted a joint report pursuant to Federal Rule of Civil Procedure 26(f) (see Docket Entry 15), Plaintiff filed consent forms signed by Jeanne Runyan ("Runyan") and Alphonso Thomas ("Thomas") (see Docket Entry 17), both of whom attested to working for Ariel more than 40 hours per week on some occasions during the preceding three years (see id. at 3-4).  According to those filings, both Runyan and Thomas (i) asserted claims under the FLSA "to recover overtime pay and other unpaid wages" (id.), (ii) designated counsel for Plaintiff as their attorneys in this action (see id.), and (iii) authorized Plaintiff to act as their agent in this action (see id.).

Via the Certification Motion, Plaintiff has requested that the Court "conditionally certify this matter as an FLSA collective action" (Docket Entry 21 at 1; see also Docket Entry 24 (supporting

4

memorandum)) and "order notice to the collective members" (Docket Entry 24 at 3). In particular, Plaintiff has defined the proposed "Misclassification Collective" as "[a]ll peer support specialists who performed work for Ariel [] as an independent contractor within the last three (3) years" (Docket Entry 21-2 at 1) and the proposed "W-2 Employee Collective" as "[a]ll peer support specialists who were employed by Ariel [] within the last three (3) years" (id.). Additionally, Plaintiff has sought certain information from Defendants "in electronically readable form" (Docket Entry 24 at 20), including "the names, addresses, e-mail addresses, telephone numbers, any employee number or unique identifier, and dates of employment for all members of the two collectives" (id.) as well as "the dates of birth and last four digits of the social security numbers of anyone whose notice is returned as undeliverable" (id.).

Together with the Certification Motion, Plaintiff tendered several versions of the above-mentioned notice, including proposed mail notices (Docket Entry 24-10 at 1-3; Docket Entry 24-15 at 1-3 (the "Mail Notices")) and consent forms (Docket Entry 24-10 at 4; Docket Entry 24-15 at 4 (the "Consent Forms")), proposed email notices (Docket Entries 24-11, 24-16 (the "Email Notices")), proposed text message notices (Docket Entries 24-12, 24-17 (the "Text Notices")), and proposed reminder notices (Docket Entries 24-13, 24-18 (the "Reminder Notices")). Additionally, Plaintiff has requested authorization to call Putative Plaintiffs who have not

responded to the notices (when 30 days remain in the opt-in period), following a script that tracks the Reminder Notices. (See Docket Entry 24 at 18-20.) Finally, Plaintiff has sought an order requiring that Defendants "post the [Mail N]otices [and Consent Forms] . . . in a conspicuous place in their offices" (id. at 21).

In support of the Certification Motion, Plaintiff submitted a declaration (Docket Entry 24-2 ("Plaintiff's Declaration")), a time sheet (Docket Entry 24-5), an invoice (Docket Entry 24-6), various emails between Plaintiff and Ariel employees (Docket Entry 24-7), and copies of two checks payable to Plaintiff (Docket Entries 24-8, 24-9), as well as declarations from Runyan (Docket Entry 24-4 (the "Runyan Declaration")) and Thomas (Docket Entry 24-3 (the "Thomas Declaration")).

According to Plaintiff's Declaration:

Plaintiff worked as a peer support specialist for Ariel, a mental health support agency, between approximately 2017 and April 30, 2020 (when her employment ended as a result of pandemic-related layoffs). (See Docket Entry 24-2, ¶¶ 2-5.) Ariel obligated its peer support specialists to perform off-the-clock work. (See id., ¶ 12). In that regard, "Ariel [] required peer support specialists to drive to various locations to provide support and mentoring to recovering [] clients" (id., ¶ 13), emailed peer support specialists about mandatory training and staff meetings (see id., ¶ 21), and directed peer support specialists "to complete client

6

notes after client visits" (id., ¶ 22). Peer support specialists "were not paid for client-to-client travel, attending staff meetings, training, completing client notes, and reading and answering phone calls, texts and emails." (Id., ¶ 19.)

Until approximately January 2020, Ariel classified peer support specialists as independent contractors (see id., ¶ 18) and did not pay "an overtime premium for all hours worked over [40] in a workweek" (id., ¶ 9). "Ariel [] scheduled the shifts [Plaintiff] worked with each client for each workweek so the company and its representatives knew its peer support specialists were working overtime." (Id., ¶ 16.) "[Plaintiff's] schedule varied from week to week[,] but [she] regularly worked more than [40] hours during a workweek." (Id., ¶ 17.) For example, during one week in August 2019, Plaintiff worked 60 hours and received no overtime pay or wages for off-the-clock work. (See id., ¶ 10.)

"Ariel [] eventually reclassified [Plaintiff] and other peer support specialists as employees but still did not pay an overtime premium for all hours worked over [40] in a workweek, including time spent traveling between clients, attending staff meetings, training, completing client notes, and corresponding with Ariel [] by phone, email and texts." (Id., ¶ 11.) Beginning in May 2020, Ariel reduced the hourly wage for peer support specialists from $20 an hour to $15 an hour and began to compensate hours worked beyond 40 hours per week at a rate of time and a half. (See id., ¶ 24.)

7

In March 2021 and again in October 2021, Ariel sent Plaintiff back pay checks (see id., ¶¶ 27-28), but neither amount accurately "compensate[d Plaintiff] for all the overtime [she] worked, much less the off-the-clock work [she] performed for the company" (id., ¶ 27) or "liquidated damages" (id., ¶ 29).

"[Plaintiff] ha[s] spoken with other peer support specialists who said they were not paid overtime . . . [or] any wages for the off-the-clock work." (Id., ¶ 20.) "To the best of [her] knowledge, [(i)] all peer support specialists employed by Ariel [] had the same or similar job descriptions and performed the same basic duties — providing support, coaching, mentoring and advocacy for recovering addicts[, (ii)] all were subject to the same payroll practice of not being paid for off-the-clock work" (id., ¶ 25), and (iii) "all . . . were classified as independent contractor[s] prior to January[] 2020[] and not paid overtime for all hours worked over [40] in a workweek" (id., ¶ 26).

According to the Runyan Declaration:

"[Runyan] worked for Ariel [] as a certified peer support specialist from approximately December 31, 2018 to April 23, 2021." (Docket Entry 24-4, ¶ 2.) During part of that time, "Ariel [] misclassified [her] and other peer support specialists as independent contractors" (id., ¶ 4). Like Plaintiff, Runyan performed mandatory off-the-clock work (see id., ¶¶ 6-13) and sometimes "worked more than [60] hours in a workweek without

8

overtime pay" (id., ¶ 15). Because Ariel set weekly schedules, it knew "[Runyan] was driving long distances without compensation" (id., ¶ 13) and "was working more than [40] hours during a workweek" (id., ¶ 14). Runyan likewise "received a check from Ariel [] for the payment of back overtime wages. . . [but she] do[es] not believe the check covered all of [her] owed overtime wages including the time traveling between clients, completing client notes, training and attending staff meetings[, or] . . . liquidated damages." (Id., ¶ 18.)

According to the Thomas Declaration:

"[Thomas] worked as a peer support specialist for Ariel [] from approximately 2018 to January[] 2021" (Docket Entry 24-3, ¶ 2), during part of which time "Ariel [] misclassified [him] and other peer support specialists as independent contractors" (id., ¶ 5). While misclassified, Thomas received no overtime premium (see id., ¶¶ 6-7), despite "frequently work[ing] more than [60] hours in a workweek" (id., ¶ 14). Moreover, Thomas never received "any wages for off-the-clock work including travel between clients, completing client notes, training, and attending staff meetings" (id., ¶ 8). Although Thomas, like Plaintiff and Runyan, "recently received a check from Ariel [] for the payment of back overtime wages[, he] do[es] not believe the check covered all of [his] owed overtime wages including the time traveling between clients,

completing client notes, training, and attending staff meetings[, or] . . . liquidated damages." (<u>Id.</u>, ¶ 17.)

The parties jointly moved to extend the deadlines for responding and replying to the Certification Motion (<u>see</u> Docket Entry 27), which extension the Court (per the undersigned United States Magistrate Judge) granted (<u>see</u> Text Order dated Dec. 7, 2021 (extending response deadline until January 31, 2022)). However, Defendants have not responded to the Certification Motion (<u>see</u> Docket Entries dated Nov. 16, 2021, to present).[1]

<b><u>DISCUSSION</u></b>

## I. Relevant Legal Standards

## A. Conditional Certification

Under the FLSA, an employee can bring an action for unpaid minimum and overtime wages on "behalf of himself . . . and other employees similarly situated." 29 U.S.C. § 216(b). For FLSA purposes, "[p]utative [] members [of a collective action] are similarly situated . . . if they raise a similar legal issue as to coverage, exemption, or nonpayment o[f] minimum wages or overtime arising from at least a manageably similar factual setting with respect to their job requirements and pay provisions." <u>McLaurin v. Prestage Foods, Inc.</u>, 271 F.R.D. 465, 469 (E.D.N.C. 2010) (internal

---

1    This Court's Local Rules permit treating an unopposed motion as conceded. <u>See</u> M.D.N.C. LR 7.3(k) ("If a respondent fails to file a response within the time required by this rule, the motion will be considered and decided as an uncontested motion, and ordinarily will be granted without further notice.").

quotation marks and ellipsis omitted). To become a party plaintiff, each "similarly situated" employee must "give[] his consent in writing to become such a party[,] and such consent [must be] filed in the court in which such action is brought." 29 U.S.C. § 216(b).

A two-year statute of limitations applies under the FLSA, except in cases of willful violations, which an employee may "commence[] within three years after the cause of action accrued," 29 U.S.C. § 255(a). For an individual claimant, a FLSA claim commences:

> (a) on the date when the complaint is filed, if [the claimant] is specifically named as a party plaintiff in the complaint and his written consent to become a party plaintiff is filed on such date in the court in which the action is brought; or
> (b) if such written consent was not so filed or if his name did not so appear — on the subsequent date on which such written consent is filed in the court in which the action was commenced.

29 U.S.C. § 256. "Because the statute of limitations continues to run" until a claimant affirmatively opts in to the lawsuit, courts employ a two-stage certification procedure for FLSA collective actions. <u>Houston v. URS Corp.</u>, 591 F. Supp. 2d 827, 831 (E.D. Va. 2008).

At the first stage, known as conditional certification, "the court determines whether the putative [collective action] members' claims are sufficiently similar to merit sending notice of the action to possible members of the [collective action]." <u>Adams v.</u>

11

Citicorp Credit Servs., Inc., 93 F. Supp. 3d 441, 453 (M.D.N.C. 2015) (internal quotation marks omitted).[2] Although "not a 'rubber-stamp approach,'" the conditional-certification standard is "fairly lenient[:]" the plaintiff "need only make a relatively modest factual showing that a common policy, scheme or plan that violated the law exists." Id. (internal quotation marks and brackets omitted). Moreover, when evaluating conditional certification, "the Court does not resolve factual disputes, decide substantive issues on the merits, or make credibility determinations . . . ." Id. at 454 (internal quotation marks omitted).

**B. Notice**

If a court decides to conditionally certify a collective action, the FLSA favors "court-controlled notice . . . to potential putative plaintiffs" as opposed to "unregulated solicitation efforts to secure joinder by those individuals." Id. at 456 (internal quotation marks omitted). Courts thus possess "managerial responsibility to oversee the joinder of additional parties to assure that the task is accomplished in an efficient and proper way." Id. (quoting Hoffmann-La Roche Inc. v. Sperling, 493

---

2  The second stage, known as decertification, only occurs if (after a grant of conditional certification) a defendant, "usually after discovery is virtually complete[,]" moves to decertify the collective action. Long v. CPI Sec. Sys., Inc., 292 F.R.D. 296, 299 (W.D.N.C. 2013). At that stage, "courts apply a heightened fact[-]specific standard to the similarly situated analysis." Id. (internal quotation marks omitted).

U.S. 165, 170-71 (1989)).  Such court-controlled notice should neutrally and accurately advise potential members of the collective action of their right to opt in without suggesting endorsement of a plaintiff's claim.  See Mebane v. GKN Driveline N. Am., Inc., 337 F.R.D. 479, 486 (M.D.N.C. 2020).  To facilitate the notice and opt-in procedure, courts have ordered litigants to share certain contact and job-related information regarding potential members of a collective action.  See id. at 487–88 (ordering the defendant to produce, within 15 days, "the name, job title, address, telephone number, email address, dates of employment, location of employment, and shift assignment" for such individuals).

## II. Analysis

## A. Conditional Certification

According to Plaintiff, the allegations of the Operative Complaint, coupled with documentation of Plaintiff's work hours and compensation, as well as the declarations from Plaintiff, Runyan, and Thomas, satisfy the conditional-certification standard.  (See Docket Entry 24 at 8-11.)  As mentioned above, Defendants have not opposed conditional certification.  (See Docket Entries dated Nov. 16, 2021, to present (reflecting no response).)

Plaintiff has demonstrated that Putative Plaintiffs qualify as "similarly situated," 29 U.S.C. § 216(b).  In that regard, Plaintiff has made a modest showing that the misclassification of Ariel peer support specialists and the denial of overtime pay for

13

off-the-clock work occurred pursuant to "a common policy, scheme or plan," Adams, 93 F. Supp. 3d at 453 (internal quotation marks omitted). More specifically, Plaintiff, Runyan, and Thomas have averred that all peer support specialists who worked for Ariel performed similar functions and remained subject to uniform policies regarding pay, training, travel, and documentation of sessions with clients. (See Docket Entry 24-2, ¶¶ 9, 12-14, 21-22, 24-26; Docket Entry 24-3, ¶¶ 8-12, 16; Docket Entry 24-4, ¶¶ 8-12, 17.) On some occasions, Plaintiff, Runyan, and Thomas each worked more than 40 hours per week without overtime compensation (see Docket Entry 24-2, ¶¶ 9-11; Docket Entry 24-3, ¶¶ 6-7; Docket Entry 24-4, ¶ 15), and none received such compensation for the off-the-clock work that Ariel required (see Docket Entry 24-2, ¶ 12; Docket Entry 24-3, ¶ 8; Docket Entry 24-4, ¶¶ 6-7). Courts have deemed conditional certification warranted under similar circumstances. See, e.g., Houston, 591 F. Supp. 2d at 832-35 (granting conditional certification for collective of employees misclassified as independent contractors); Williams v. XE Servs., LLC, No. 2:09CV59, 2011 WL 52353, at *1-4 (E.D.N.C. Jan. 4, 2011) (unpublished) (same); Dennis v. Sandhills Emergency Physicians, P.A., No. 1:20CV273, 2021 WL 1195862, at *6 (M.D.N.C. Mar. 30, 2021) (unpublished) (granting conditional certification based in part on claim regarding mandatory uncompensated off-the-clock work). Especially given Defendants' silence on the subject, the Court

14

concludes that Plaintiff has satisfied the conditional-certification standard.

## B. Notice

Plaintiff has urged the Court to approve notice to Putative Plaintiffs via various methods during a 60-day opt-in period and to require that Defendants provide Plaintiff with certain information about Putative Plaintiffs. (See Docket Entry 24 at 20-21.) Defendants have not objected to the length of the opt-in period or any of the notices and have expressed no position as to the production of information or posting the Mail Notices and Consent Forms at their offices. (See Docket Entries dated Nov. 16, 2021, to present (reflecting no response).) Notwithstanding Defendants' lack of response, the Court will consider each request in turn and grant only some of the requested relief.

### 1. Length of Opt-In Period

Plaintiff has proposed a 60-day deadline, commencing on the date that Plaintiff sends the notices, for Putative Plaintiffs to opt in to this action. (See Docket Entry 24 at 20.) The Court discerns no reason to deviate from that request, particularly given Defendants' failure to challenge it. See Clark v. Williamson, No. 1:16CV1413, 2018 WL 1626305, at *8 (M.D.N.C. Mar. 30, 2018) (unpublished) (deeming 60-day opt-in period appropriate and collecting cases). The Court notes that Plaintiff has asked for 14 days, from the date of this Order, to send the notices. (See

Docket Entry 24 at 19.)  Accordingly, the opt-in period shall last until July 12, 2022.

### 2. Production of Information

As already mentioned, Plaintiff has asked that Defendants produce "the names, addresses, email addresses, telephone numbers, dates of employment (to determine membership in either or both collectives), and any employee number or unique identifier of the collective members in an electronic format to facilitate notice." (Docket Entry 24 at 12 (internal footnote omitted).)[3] Furthermore, Plaintiff has sought "the dates of birth and last four digits of social security numbers of anyone whose notice is returned as undeliverable to enable skip tracing of those individuals." (Id. at 13.)

"While courts have routinely approved requests for home addresses and email addresses, courts have been more reluctant to authorize the disclosure of other private information, such as dates of birth, social security numbers, and telephone numbers." Clark, 2018 WL 1626305, at *5; see also id. at *6 ("direct[ing] [employer] to produce . . . the names, last known home addresses, email addresses, and employee number or unique identifier of the putative class members" but "den[ying ]motion for the production of

_____

3  According to Plaintiff: "Unique identifiers are used to maintain database integrity in producing payroll.  Providing the company's unique identifiers will allow Plaintiff to sync the resulting database of clients with [Ariel]'s databases for determining merits and damages issues." (Id. at 12 n.3.)

telephone numbers for all collective members in the first instance); Amrhein v. Regency Mgmt. Servs., LLC, Civil No. 13-1114, 2014 WL 1155356, at *10 (D. Md. Mar. 20, 2014) (unpublished) ("[A]bsent a showing by plaintiffs of a 'special need' for disclosure of class members' telephone numbers or other personal information, such as social security numbers or dates of birth, ordering such disclosure is inappropriate.").

Here, consistent with the foregoing authority, Defendant must provide Plaintiff with a list of names, addresses, email addresses, dates of employment, and any employee number or unique identifier of Putative Plaintiffs. However, because Plaintiff has not demonstrated a "special need" for disclosure of Putative Plaintiffs' telephone numbers (see Docket Entry 24 at 12-14), Defendants should not produce such information in the first instance.

Plaintiff's request for compelled production of Putative Plaintiffs' dates of birth and last four digits of their social security numbers stands on slightly different ground, given that Plaintiff has limited that request to "anyone whose notice is returned as undeliverable" (id. at 13). The Court agrees that undeliverable notices may justify further efforts to contact Putative Plaintiffs but will follow other courts in authorizing disclosure of only telephone numbers in that circumstance. See, e.g., Clark, 2018 WL 1626305, at *6 (citing Houston, 591 F. Supp.

17

2d at 836 & n.9); <u>Houston</u>, 591 F. Supp. 2d at 836 n.9 ("To the extent the notice mailed to putative collective action members is returned undeliverable, [the p]laintiffs may request from [the d]efendants the phone number of those individuals so that [the p]laintiffs may contact the [putative collective action member] to obtain a current mailing address."). If Plaintiff learns that neither the Mail Notices nor Email Notices have reached a Putative Plaintiff, Plaintiff may solicit that Putative Plaintiff's telephone number from Defendant, for purposes of obtaining a current mailing (and/or email) address.

### 3. Mail Notices and Consent Forms

The Mail Notices describe this action (including the relief sought) and explain how Putative Plaintiffs may opt in (via the attached Consent Forms). (<u>See</u> Docket Entries 24-10, 24-15.) "The Court has the power and duty to ensure that the notice is fair and accurate, but should only alter a plaintiff's proposed [n]otice when such an alteration is necessary." <u>Kirkpatrick v. Cardinal Innovations Healthcare Sols.</u>, No. 1:16CV1088, 2017 WL 3841858, at *7 (M.D.N.C. Sept. 1, 2017) (unpublished) (internal quotation marks omitted). The Court views the Mail Notices and Consent Forms as generally acceptable, but, to more accurately advise Putative Plaintiffs about the consequences of joining this action, Plaintiff should add the following information to the Mail Notices: "While the suit is proceeding, you may be required to provide information,

18

sit for depositions, and testify in court." Clark, 2018 WL 1626305, at *8; see also id. at *7–8 (requiring such disclosure even when opposing party waived objection to contents of notice).

### 4. Email Notices

The Email Notices similarly provide basic information about this action, reference the attached Mail Notices, and provide a link allowing electronic access to the Mail Notices and Consent Forms. (See Docket Entries 24-11, 24-16.) Plaintiff may use the Email Notices as written (as long as they direct Putative Plaintiffs to Mail Notices that Plaintiff has amended consistent with this Order).

### 5. Text Notices

The Text Notices effectively mirror the Email Notices, in slightly shortened form, and similarly include a link to the Mail Notices and Consent Forms. (See Docket Entries 24-12, 24-17.) For the reasons already explained, the Court denied Plaintiff's request for compelled production of Putative Plaintiffs' telephone numbers (at least at this stage), rendering moot further discussion of the Text Notices.

### 6. Reminder Notices and Calls

The Reminder Notices describe previous attempts at communication (via the Mail Notices, Email Notices, and Text Notices) regarding this action and remind the recipient of the opt-in deadline. (See Docket Entries 24-13, 24-18.) Courts have

19

declined to allow reminder notices absent a showing of need for the same. _See_ _Mebane_, 337 F.R.D. at 487 ("The Court thus finds no basis for permitting an additional mailing and finds, as other courts have, that 'additional notice is [unnecessary] and . . . may take on an element of harassment.'" (quoting _Irvine v. Destination Wild Dunes Mgmt., Inc._, 132 F. Supp. 3d 707, 711 (D.S.C. 2015)); _Williams v. GGC-Baltimore, LLC_, No. 1:19CV274, 2019 WL 2058903, at *3 (D. Md. May 8, 2019) (unpublished) (denying such request "absent a showing that some special circumstance necessitates multiple notices").

Here, Plaintiff has not supported the request to send Reminder Notices with reference to any "special circumstances" (_see_ Docket Entry 24 at 17-18), but in attempting to justify reminder phone calls, Plaintiff has emphasized that peer support specialists "are often engaged in support assignments away from their homes" (_id._ at 18). The Court deems that circumstance sufficient to warrant Reminder Notices, which Plaintiff must revise to omit the reference to the Text Notices. _See_ _Clark_, 2018 WL 1626305, at *7 (allowing reminder notices when litigant "raised legitimate concerns regarding the ability to reach potential class members who may be often engaged in care assignments away from their homes"). However, "[t]he [C]ourt denies the request to make scripted reminder calls to [Putative Plaintiffs] who have not responded to

the initial notice on the grounds that such calls are cumulative and have the risk of pressuring would-be plaintiffs to act." Id.

7. Posting

Turning to the proposed requirement that Defendants post the Mail Notices and Consent Forms in their offices, the Court deems such proposal reasonable, especially given that "district courts routinely approve initial notice to potential plaintiffs by regular mail, email, and posting at the defendant's workplace." Chavez v. T&B Mgmt., LLC, No. 1:16CV1019, 2018 WL 4398261, at *6 (M.D.N.C. Sept. 14, 2018) (unpublished) (emphasis added) (collecting cases); see also Mendoza v. Mo's Fisherman Exch., Inc., Civ. Action No. 15-1427, 2016 WL 3440007, at *21 (D. Md. June 22, 2016) (unpublished) ("[Posting] is commonly allowed when potential plaintiffs work in the same physical location.").

<u>**CONCLUSION**</u>

Plaintiff has shown that Putative Plaintiffs qualify as "similarly situated," such that the Court will conditionally certify this matter as a collective action and provide for court-authorized notice in the modified manner detailed in the Discussion section.

**IT IS THEREFORE ORDERED** that the Certification Motion (Docket Entry 21) is **GRANTED IN PART AND DENIED IN PART,** such that the opt-in period shall last until July 12, 2022; Plaintiff may use the Mail Notices, Email Notices, and Reminder Notices, except that they

21

must revise the Mail Notices and Reminder Notices in a manner consistent with this Order; and Plaintiff may not use the Text Notices or make reminder phone calls.

**IT IS FURTHER ORDERED** that, on or before May 6, 2022, Defendants shall post the (amended) Mail Notices and Consent Forms at their facilities and, by May 6, 2022, shall provide Plaintiff in electronically readable form, the names, addresses, e-mail addresses, any employee number or unique identifier, and dates of employment for all members of the two collectives conditionally certified via this Order.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

April 29, 2022